John C. WAGNER, Peter C. Unger, Robert L. Wagner, Appellants,

v.

UNITED STATES of America, Appellee.

Nos. 22680, 22680–A and 22680–B.

United States Court of Appeals Ninth Circuit.

Sept. 11, 1969.

Rehearing Denied Nov. 19, 1969.

Willard Jones, Sacramento, Cal. (argued) for John C. Wagner.

Joseph O'Connor, San Diego, Cal. (argued) for Unger.

Barry Freeman, Chicago, Ill. (argued) for Robert L. Wagner.

Arthur F. Mathews (argued) and Burton H. Finkelstein (argued), John N. Fegan, David J. Levenson, Attys., S. E. C., Washington, D. C., Sidney I. Lezak, U. S. Atty., Norman Sepenuk, Asst. U. S. Atty., Portland, Or., for appellee.

Before BARNES and KOELSCH, Circuit Judges, and HALL, District Judge*

BARNES, Circuit Judge:

The indictment in the above case was returned December 7, 1966, charging a California corporation, an Oregon corporation, a Nevada corporation, and eight individuals in Count I with a conspiracy to violate what are sometimes referred to as the "private" fraud provisions of the statutes, viz., the Securities Act, 15 U.S.C. 77q(a), and the Mail Fraud Statute, 18 U.S.C. § 1341. Among the individuals were there separate appellants, John C. Wagner, Peter C. Unger and Robert L. Wagner,[1] whose appeals were consolidated for hearing.

The California corporation and the Oregon corporation appeared at arraignment and pleaded not guilty, but the case was dismissed as to them sometime during trial, as well as to the Nevada corporation and the individuals Shubin and Kosieris. The individual defendants Stewart, Christensen and Jongward entered nolo pleas so that verdicts on Count I were returned as to the only remaining defendants, appellants here, John Wagner, Peter Unger and Robert Wagner.

Counts II to XIII, inclusive, charged substantive offenses in violation of either the Securities Act or the Mail Fraud Statute. John Wagner, but not Unger or Robert Wagner, was named in each of them. Count XII of the indictment was dismissed prior to trial, and Counts IV and VII were dismissed at the conclusion of the Government's case.

Count XIV charged another conspiracy to violate those provisions of the law calculated to prevent fraud upon the Government or its instrumentalities, viz., Title 18, U.S.C. Sec. 1001, and Title 18, U.S.C. Sec. 2314. It thus was a different conspiracy than alleged in Count I, and named only six of the eight individual defendants named in Count I, and did not name any of the corporations. It did name John C. Wagner and Robert L. Wagner, but did not name Peter Unger. With the exception of John C. Wagner and Robert L. Wagner, all of the defendants named in Count XIV pleaded nolo during the trial, except defendant Kosieris who was dismissed.

Robert Wagner, charged only in Counts I and XIV, was acquitted as to Count XIV and convicted on Count I. John Wagner was convicted on Count XIV, as well as on Counts XV to XVII which charged substantive offenses either in violation of 18 U.S.C. § 1001 or 18 U.S.C. § 2314. He was also convicted on Counts I, II, III, V, VI, VIII, IX, X, XI and XIII.

Peter Unger was charged in, and found guilty, only as to Count I.

Appellant John Wagner raised thirteen points on his appeal. Appellant Robert Wagner raised five. Peter Unger raised ten points. Each of the appellants adopted all of the points raised by each of the other appellants. However, on argument, counsel for each of the appellants limited their argument to one point as to each of them and stated they did not abandon their other points. It is necessary to consider only a few of the many points raised.

It would serve no useful purpose to restate or summarize here the charges of the indictment. Twelve pages are devoted to a description of the conspiracy and scheme charged in Count I and sixty-four overt acts are alleged. Three pages and seventy-two overt acts describe the

---

* Hon. Peirson M. Hall, Senior Judge, United States District Court, Los Angeles, California, sitting by designation.

1. It is claimed there is no relationship between John Wagner and Robert Wagner, but the record shows that on one occasion John Wagner represented that Robert Wagner was his father.

conspiracy and scheme charged in Count XIV.

Suffice it to say that the real estate activities of the defendants in a very short period of time range through Elsinore, California; Beverly Hills, California; Pismo Beach, California; Arroyo Grande, California; Santa Maria, California; Oceano, California; Roseville, California; Hawaii; Phoenix, Arizona; Portland, Oregon; Salt Lake City, Utah; Pueblo, Colorado; Ely, Nevada; Las Vegas, Nevada; Albuquerque, New Mexico, and El Paso, Texas. They involved approximately forty major complex real estate transactions, to say nothing of the numerous transactions between one defendant or another and their respective wives, creating promissory notes and trust deeds many times the value of the property covered which were used in turn to purchase other property, and in padding financial statements, frequently putting a highly inflated value upon property.[2] The defendants sometimes claimed ownership to property which they did not own.

In examining the briefs and records in this case, there comes to mind the statement of Judge Hand in United States v. Cohen, 145 F.2d 82, 88 (2d Cir. 1944), where he stated:

"It is a strange conception of justice that, if one only tangles one's crimes enough, one gets an immunity because the result is beyond the powers of a jury to unravel."

I. *No. 22,680–B—Appeal of Robert L. Wagner.*

 As noted, Robert Wagner was acquitted on Count XIV and convicted on Count I. His principal attack is that by letting the case go to the jury against him on both Count I and Count XIV (in both of which he was named), he became prejudiced because he asserts no one can know whether or not the jury among themselves bargained to acquit him on

XIV if he were convicted on Count I. The principal basis of counsel's attack is, as he said in the argument, "you can't trust a jury." This requires us to determine whether or not the evidence was sufficient to compel the granting of a judgment of acquittal on either Count I or XIV at the conclusion of the evidence. An examination of the indictment and of the evidence compels the conclusions that there was sufficient evidence upon which the jury could have convicted Robert Wagner on Count XIV as well as Count I. If there is sufficient evidence in the record so that reasonable minds might differ as to the result, then the question becomes one of fact for the jury to resolve and not one of law to be determined by the court. Isaacs v. United States, 301 F.2d 706, at 726–727 (8th Cir. 1962), and cases there cited. Without reviewing the evidence in detail, it is sufficient to say from an examination of the whole record that there was sufficient evidence of Robert Wagner's participation in the conspiracy charged in both Count I and Count XIV that it would have been improper for the court to have granted the motion for a judgment of acquittal, and taken the case as to Robert Wagner on either count from the jury. We affirm.

II. *No. 22,680–A—Appeal of Peter Unger.*

Unger was found guilty of Count I, the conspiracy count. He was a real estate broker, investor and dealer, largely in California. He first dealt with John Wagner in the Elsinore property deal in Southern California in 1962, acting as his broker. He admittedly bought and sold properties between himself and John Wagner in some thirty to fifty transactions, primarily in the Elsinore, California area.

To understand what these "transactions" were, we quote in the margin from that portion of Count I which describes some of them (and which we deem an ac-

---

2. One instance is typical: A barren tract acquired for $120,000 in purchase money notes and trust deeds was listed as having a value of $6,525,000 after the purchase money notes and trust deeds were in default.

curate description, as established by the evidence).[3]

While Unger did not use the fictitiously valued promissory notes as freely as other defendants may have, he admittedly (a) paid a small amount in Hawaii ($20.00) on one note he had given to John Wagner, (b) otherwise made no attempt to pay on the notes he had executed and delivered to John Wagner, (c) knowingly used some of the Wagner "inflated" notes to acquire property himself, and (d) realized a $45,000 second trust deed for the use of his name on paper connected with the "Harbor Lights" transaction.

Unger claims error based on alleged misjoinder, variance, newspaper publicity, lack of effective representation, insufficiency of the evidence,[4] and more particularly, of the denial of his motion for a change of venue.

We find no merit in his various claims (including others not specifically referred to herein). We point out, with respect to his claim that there should have been a change of venue, that the transactions involved in Count I occurred in at least ten different federal court districts. Unger was directly or indirectly "in" on most of these deals. More occurred in Oregon than in any other district.[5] Hence, Unger's claim to be tried "of right" in the Southern District of California at San Diego is without substance.

3. Various defendants (including Unger) " * * * contrived and executed a series of deceptive real estate transactions for the purpose and with the intent of creating worthless and spurious promissory notes and trust deeds which they could then trade to others in exchange for properties and services. To accomplish this purpose, one of said defendants would and did acquire the real estate with little or no cash down payment, giving a promissory note and purchase money mortgage or trust deed to the seller; the real estate would then be purportedly 'sold' and conveyed by said defendant to another defendant at an inflated price, and the purchasing defendant would execute and deliver to the selling defendant promissory notes secured by trust deeds for the amount of the inflated price. The promissory notes and trust deeds collusively created in this manner, would be and were at some subsequent time, in the operation of their fraudulent scheme offered and assigned by defendants, as partial payment, or as security for payment, for real estate, services, or other properties, to persons who were uninformed concerning the defendants' collusive and deceptive practices and who were led to accept said notes and trust deeds by the false representations of defendants that said promissory notes and deeds of trust were good and valuable securities, that the persons issuing said notes and trust deeds had made substantial payment on, and had substantial equities in, the properties covered by the trust deeds, and that payments endorsed on said promissory notes were being currently made and would continue to be made by the issuers of said securities; whereas, in truth and in fact, as the defendants well knew and omitted to disclose, the said trust deeds and notes were of little or no value, the persons issuing said notes and trust deeds had made no down payment on the properties and had no equity therein, the liens of said trust deeds were in all cases junior to other encumbrances, the total of which far exceeded the value of the properties, no payments had been made on said promissory notes, and the payments endorsed on said notes were fictitious and had been deceptively shown and entered by the defendants in order to delude the persons accepting said notes into the belief that the persons issuing said notes would be making the payments thereon promptly when due and that current income thereon was assured." (C.T. p. 6, line 7 to p. 7, line 16.)

There then follows three and one-half pages of additional "parts" of the alleged fraudulent scheme.

4. As an example of the effectiveness of this claim of error, the trial lasted 14 days, the Government called 109 witnesses; defendant Christensen one; Robert Wagner 4 and himself; Unger called no witnesses other than himself. All witnesses called by the defendants had been subpoenaed by the Government.

5. As the Government Brief points out (p. 65), of the 155 various transactions, including overt acts, 96 involved a substantial nexus with Oregon. As to Count I alone, a lesser percentage involved Oregon.

■ At no time has defendant Unger (nor has defendant John Wagner, for that matter) shown that the "substantial balance of convenience" in this case required a change of venue. It might well have been more convenient to one or more defendants to have had a change of venue to one or more other districts, but that reason is insufficient to *require* the trial judge to order a change of venue. Of the proposed Government witnesses (whose names were disclosed to defendants prior to trial) 99 were from Oregon. Of the 109 testifying, 37 were from Oregon, 19 from Southern California, 14 from Northern California, 17 from Hawaii, 7 from Nevada, 5 from Arizona, and 4 from other states. See Platt v. Minnesota Mining & Mfg. Co., 376 U.S. 240, 245, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964). The ultimate decision in such matters must largely rest in the sound judicial discretion of the trial judge. United States v. Luros, 243 F.Supp. 160 (N.D.Iowa 1965). That discretion was here exercised, and we think, was wisely exercised.

Defendant Unger's only other point that requires discussion is his claim that he did not receive a proper warning before making his pre-indictment statements to the F.B.I. We point out (1) that the defendant Unger was not in custody when he made the statements, (2) that he voluntarily gave the three statements, (3) that the May 17th, 1966 and June 1st, 1966 interviews were given post-*Escobedo* and pre-*Miranda*, (4) that the August 29th, 1966 interview was given after *Miranda's* effective date, and that a full *Miranda* type warning had been given him in writing prior to his statement, and that defendant Unger signed a printed form of a *Miranda* waiver, (5) that the court at pre-trial raised the question whether any involuntary statements were made, and no issue was raised by Unger's attorney, (6) that no objection during the trial was made to the introduction into evidence of the F.B.I. statements, on any ground.

The claim of Unger that he was "unrepresented" fails because of the record before us. His defense at trial was no "mockery of justice." The opposite was true.

We affirm Unger's convictions.

### III. No. 22,680—John C. Wagner.

For the reasons hereinbefore set forth, with respect to the other defendants, we need not discuss John C. Wagner's claim of error with respect to: (1) severance of offenses and defendants; (2) venue; (3) publicity; (4) that there was error in the introduction into evidence (a) of portions of his own deposition; (b) of Unger's deposition.

We do find no merit in the defendant John Wagner's claims: (5) that it was error to inform the jury certain defendants had pled nolo contendere; (6) that accumulated non-errors somehow add up to error; (7) that his motion for a continuance was denied; (8) that he can rely on unspecified points raised by other defendants.

We consider here the remaining claims of John C. Wagner, namely: (9) that he was deprived of his right to counsel; (10) that he was denied due process as to subpoenas for witnesses, and with respect to funds to "investigate."

We note with interest that appellant John C. Wagner never asserts there was an insufficiency of the evidence against him. Indeed, he could not, for it was mountainous—completely convincing.

■ As to counsel, it would be more accurate for John C. Wagner to claim he was denied at the trial counsel "of his own *present* choice" (emphasis added)— not that he was "denied counsel." The latter is a completely spurious claim.

We quote from the Government's Brief, which in this case we find merits confidence in the truth of its recitals:

> "Well in advance of trial, John Wagner's attorney, Robert Bunnett, was specially admitted to the bar of the United States District Court for the District of Oregon on January 25, 1967, and was then informed of the court's rule requiring him to associate with an active member of the bar of

the State and of the Court. (Pre-Tr. 5, January 25, 1967). On March 1, 1967, Mr. Bunnett informed the court that he would be assisted by his brother who was associated with him in California, and that the Bunnett brothers proposed to try the entire case for John Wagner and another defendant with the assistance of an inexperienced local attorney. At this point, Chief Judge Solomon advised Mr. Bunnett that local court rules [note omitted] required the local attorney affiliated or associated with outside counsel in a case to participate meaningfully in the trial, and consequently it was suggested that John Wagner obtain a more experienced local counsel to be associated with his out-of-state counsel (Pre-Tr. 4–5, March 1, 1967). In making this suggestion, Chief Judge Solomon was not only complying with the spirit of the local court rule, but was protecting the defendant's right to assistance of effective and competent counsel.

"On May 3, 1967, Judge Robert C. Belloni, the trial judge, suggested that the requirement of local counsel might be waived, allowing John Wagner to proceed to trial with counsel of his own choosing. But when the prosecution pointed out that it intended to call Mr. Bunnett as a government witness at the trial, he properly resigned from the case. (Pre-Tr. 3–4, May 3, 1967). [note omitted]

"[On Monday] May 8, 1967, more than two months prior to the commencement of the trial, John Wagner was provided with new court-appointed counsel, Lewis Hampton, allowing ample time for consultation and preparation for trial. (Pre-Tr. 3, May 8, 1967). The record amply demonstrates that the trial court and the government afforded John Wagner and his defense counsel every consideration to assist them with their preparation for trial, including full and broad pretrial discovery, frequent opportunities to use government facilities to contact and interview witnesses, and the availability of subpoenas at government ex-pense for defense witnesses upon a reasonable showing that the witnesses were necessary for an adequate defense." (Appellee's Brief, pp. 83–85.)

We note, as the Government did not, that apparently Mr. Bunnett (the only lawyer John C. Wagner identified as one he desired) was not as certain as his client that he should represent Mr. Wagner.

On March 30, 1967, Mr. Bunnett stated: "It is unprofitable and impractical for me to try to represent them up here" (R.T. p. 2806, ll. 20–22), and on January 25, 1967, Mr. John C. Wagner stated: "Mr. Bunnett will handle the defense for the corporation, and the defendants individually * * * we will have an attorney handle our defense" (p. 2, Transcript of that date), and codefendant Christensen said (likewise on January 25, 1967) of Mr. Bunnett: "This gentlemen will be representing the corporation, not the individuals."

Mr. Bunnett was actually called by the Government at the trial, and testified (R.T. 2007–2020.)

We have carefully considered the manner in which court-appointed counsel, Lewis Hampton, performed his duties during the trial. His problem was the evidence introduced against his client, and not any lack of effort or judgment on his part. Surely the defense here presented did not even approach the point where it made the trial "a farce, or a mockery of justice," to use a familiar phrase. We find no merit in John Wagner's claim he had no counsel.

Finally, we consider the defendant John C. Wagner's contentions that he was denied due process when the trial court refused to grant his motion for subpoenas and funds ($3,000) to investigate witnesses.

Various conclusionary general statements are made by appellant John C. Wagner in regard to this alleged error. References are made to alleged statements made and alleged legal positions taken at the trial without supporting references to the record, or with the admission that such statements or positions do

not appear in the record (Appellant John C. Wagner's Brief, pp. 52, 53). The Government Brief correctly refers to these as "distortions and inaccuracies," which they appear to be.

After a careful examination of the record on this alleged error, we can only conclude the Government's answering brief is correct when it states (p. 77):

" * * * [E]xamination of the record, fairly presented, indicates it was the failure of John Wagner and his counsel to make a reasonable showing of 'necessity,' not an abuse of discretion by the trial court that formed the basis of the court's decision to refuse to issue at Government expense subpoenas in addition to the 13 that had been issued. The fact that none of the 13 witnesses so subpoenaed were ever called by John Wagner to testify indicates that the court's refusal to issue additional subpoenas was indeed proper."

Rule 17(b), Fed.R.Crim.P., under which some 325 subpoenas were originally sought at Government expense by John Wagner, specifically requires a satisfactory showing, not only that the defendant is financially unable to pay the fees of the witnesses, but that the presence of the witnesses is necessary to an adequate defense.[6]

■ Obviously, the right given to a defendant is not absolute, but is to be governed by the sound discretion of the trial judge, which will not be disturbed by an appellate court unless exceptional and compelling circumstances clearly indicate an abuse of discretion. Thompson v. United States, 372 F.2d 826, 828 (5th Cir. 1964); United States v. Zuideveld, 316 F.2d 873, 881 (7th Cir. 1963), cert. denied 376 U.S. 916, 84 S.Ct. 671, 11 L.Ed.2d 612.[7]

■ As an example, it seems obvious that witnesses whose testimony would be cumulative need not be subpoenaed. *Cf.* Thompson v. United States, *supra*, 372 F. 2d at 828.

■ The Government's Brief (pages 72 to 77) goes into great detail, with specific parenthetical references to pretrial and trial transcript (including dates) which completely refute the position that any satisfactory showing was made by defendant John C. Wagner which demonstrated that such subpoenas need be issued. In fact, after being assured by the court on the pre-trial hearing of July 10, 1967, that defendant John Wagner could offer and the court would hear any further motions to establish "necessity," no such showing was subsequently made or attempted to be made. The trial court on July 25th, 1967, granted subpoenas for 13 defense witnesses. *At the trial John Wagner called not one defense witness.*

John Wagner's attorney explained part of his client's problems when he stated, on July 31, 1967:

"We will state for the record that I have tried to contact witnesses, and quite frankly, your honor, *some of the witnesses have not indicated to me on*

---

6. Rule 17(b) is not a mere grant of general authority. It sets forth in detail certain requirements. It provides:

"(b) *Defendants Unable to Pay.* The court shall order at any time that a subpoena be issued for service on a named witness upon an *ex parte* application of a defendant upon a satisfactory showing that the defendant is financially unable to pay the fees of the witness and that the presence of the witness is necessary to an adequate defense. If the court orders the subpoenas to be issued the costs incurred by the process and the fees of the witness so subpoenaed shall be paid in the same manner in which similar costs and fees are paid in case of

*a witness subpoenaed in behalf of the government."*

7. It is of interest to note that in appellant John C. Wagner's Reply Brief, the *Zuideveld* case, *supra*, is sought to be distinguished because the defendant there requested the subpoenaing of 420 witnesses who were members of a homosexual correspondence club. In that decision the trial court underscored the words *four hundred and twenty witnesses.* Here Wagner requested subpoenas for a mere 325 defense witnesses, both for pre-trial questioning and trial testimony. C.T. 134–43.

*the phone what they were thought by my client to be indicating."* (R.T. 2122–23, emphasis added.)

The willingness of the trial court to cooperate with this defendant's counsel in obtaining any necessary witnesses is clearly established at page 2124 of the Reporter's Transcript. There the court said:

"THE COURT: Well, first of all, on any reasonable request, certain subpoenas will be issued for any of these witnesses that you mentioned, without any affidavit or anything else."

John Wagner's attorney answered "Okay," and stated the requests would be made the next morning. *No requests were ever made* for the witnesses so mentioned, and no showing of necessity was ever attempted for any proposed witness.

Having concluded that all defendant John C. Wagner's claims of error are groundless and without merit, we affirm his convictions.

Affirmed as to all defendants.