**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Joe LEWIS and Tommy Allen Combs,**
**Defendants-Appellants.**

**No. 74–1242.**

United States Court of Appeals,
Sixth Circuit.

Argued June 19, 1974.

Decided Oct. 8, 1974.

21. U.S. Dept. of Agriculture Report #957, Base Plans in U.S. Milk Markets, 17, 21, and 7 C.F.R. § 1125.60 (1964).

Dan Jack Combs, Combs & Combs, Pikeville, Ky., on brief, for defendants-appellants.

Eugene E. Siler, U. S. Atty., John M. Compton, Eldon L. Webb, Asst. U. S. Attys., Lexington, Ky., on brief, for plaintiff-appellee.

Before PHILLIPS, Chief Judge, and WEICK and ENGEL, Circuit Judges.

PHILLIPS, Chief Judge.

Joe Lewis and Tommy Allen Combs appeal from a jury conviction for trans-porting stolen explosive materials in violation of 18 U.S.C. § 842(h).[1] We affirm.

### I.  Facts

About midnight on Sunday, September 3, 1972, two Kentucky state policemen were in a rural area of Perry County investigating a "drunk complaint of a pickup truck that was supposed to be red." A red Chevrolet pickup truck with a white homemade camper on it soon passed their police cruiser. The officers further noticed that the pickup had defective tail lights and a loud muffler.

The officer driving the police cruiser turned on his blue rotating beacon and the pickup pulled off to the side of the road and stopped. The police officers parked approximately six to eight feet directly behind the pickup and apparently left their cruiser's headlights on as they walked toward the pickup. At the request of the officers the driver of the pickup, the appellant Lewis, displayed his driver's license. One of the officers testified that he gave Lewis a traffic citation for defective tail lights and muffler, presumably in violation of K.R.S. §§ 189.050 and 189.140 respectively. The appellant Combs was a passenger in the pickup.

As the officers initially approached the pickup from the rear, they saw through the window in the rear of the camper some boxes labeled "danger electrical blasting caps."[2] After ordering the appellants to get out of the pickup, the officers inquired as to what the appellants were hauling. The appellants disclaimed any knowledge of the contents of the camper, saying that the pickup was owned by another person. Appellant Lewis was then asked to open the rear door of the camper. He refused and told the officers that if they wanted it opened to do it themselves.

---

1.  18 U.S.C. § 842(h) provides as follows:
    "It shall be unlawful for any person to receive, conceal, transport, ship, store, barter, sell, or dispose of any explosive materials knowing or having reasonable cause to believe that such explosive materials were stolen."

2.  There was varying testimony as to the exact label on the boxes. "Danger electrical blasting caps," or something closely approximating that, appears to have been the most likely marking on the boxes.

The officers then searched the appellants, advised them of their rights and placed them in the police cruiser. While one officer remained in the cruiser with the arrestees, another searched the pickup which appeared to be heavily loaded. He found a large quantity of electrical dynamite caps in the rear and two rifles, one tire tool and a pair of bolt cutters in the cab. It was later determined that the boxes found in the rear of the pickup contained over 1,800 blasting caps, which were valued at approximately $2,000. The next morning the officers discovered that a large quantity of blasting caps were missing from the magazine of a construction company in a nearby county.

Prior to the trial in the District Court, the appellants were tried in state court on two separate charges. They were found not guilty in Perry Circuit Court on the charge of possession of burglary tools. However, they were found guilty in Leslie Circuit Court of the offense of breaking and entering the construction company's magazine and carrying away therefrom electrical blasting caps.

## II. Judicial Administration Issues

On appeal from their convicton in the District Court, appellants raise numerous assignments of error. Of primary importance are three alleged errors of judicial administration and procedure.

The genesis of each of these three alleged errors is appellants' claim that they were moved "from pillow to post" within the Eastern District of Kentucky with no regard to their convenience or the convenience of witnesses. The following table presents a summary of relevant actions taken in this case, the date, and the location within the district at which the action was taken.

| Action | Date | Location |
|---|---|---|
| 1. Indictment returned | November 8, 1972 | Jackson |
| 2. Arraignment | November 15, 1972 | Pikeville |
| 3. Action transferred from Jackson docket to Pikeville docket | December 15, 1972 | |
| 4. Hearing on suppression motion | February 15, 1973 | London |
| 5. Further hearing on suppression motion | May 14, 1973 | Pikeville |
| 6. Action transferred from Pikeville docket to Lexington docket | August 1, 1973 | |
| 7. Jury trial resulting in hung jury; Action subsequently reassigned to Pikeville docket | Sept. 10–12, 1973 | Lexington |
| 8. Jury trial resulting in conviction | Oct. 29–31, 1973 | Pikeville |

(A) Appellants contend that the District Court violated the following venue requirement of Fed.R.Crim.P. 18: "The court shall fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses." Prior to the beginning of their first trial in Lexington, on September 10, 1973, appellants moved to dismiss the indictment or, in the alternative, for an

order "staying all proceedings against them in any division of this Court except the Jackson Division, and staying any trial by any jury other than a jury drawn from the counties comprising the Jackson Division of this Court." Appellants maintain throughout their brief and oral argument that Jackson is a division of the Eastern District of Kentucky. As more fully discussed in II(B) below, this contention is erroneous. 28 U.S.C. § 97(a).

Although the District Court later overruled the motion to dismiss the indictment, it did not rule on the alternative motion to stay all proceedings except those at Jackson. In support of their alternative motion, appellants stated that they were residents of Perry County, that the alleged offense occurred in Perry County, that practically all of the witnesses resided in Perry County, and that Perry County was some 30 miles from Jackson and some 120 miles from Lexington. Pikeville, the location of the second trial, is said to be some 80 miles from Jackson.

Appellants rely on Dupoint v. United States, 388 F.2d 39 (5th Cir. 1967), in which a conviction was reversed where the prosecution of a federal crime was transferred 42 miles farther from the scene of the alleged offense for the convenience of the prosecution, and not for the convenience of the defendant or witnesses. The Government asserts that *Dupoint* is distinguishable on the ground that the Middle District of Georgia, where the *Dupoint* case arose, is divided by statute into several divisions, 28 U.S. C. § 90(b), unlike the Eastern District of Kentucky where there are no divisions. 28 U.S.C. § 97(a).

■■ We regard this as a relatively close issue and do not believe that the

distinction between this case and *Dupoint* cited by the Government is dispositive. The existence or nonexistence of division lines within a federal judicial district cannot be held to determine a question of whether venue properly exists at a particular location within the district. Indeed, a 1966 amendment of Fed.R.Crim.P. 18 deleted a provision reading, "but if the district consists of two or more divisions the trial shall be had in a division in which the offense was committed." In eliminating the requirement of division venue, the 1966 amendment recognized that the presence of venue at a particular place is controlled by numerous factors, e. g., proximity of defendant's residence, proximity of witnesses and counsel, docket conditions which bear on whether a defendant receives a speedy trial, and proximity of records and documents, and should not be hemmed in by artificial boundary lines drawn by Congress.[3]

■■ Rule 18 merely states the traditional rule of "forum non conveniens" and vests discretion in the District Court to determine the proper place of trial. Houston v. United States, 419 F. 2d 30, 33 (5th Cir. 1969). Trial judges traditionally have been held to have wide discretion in disposing of change of venue motions. Platt v. Minnesota Mining & Mfg. Co., 376 U.S. 240, 245, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964); United States v. Projansky, 465 F.2d 123, 139 (2d Cir.), cert. den., 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972); Wagner v. United States, 416 F.2d 558, 561–562 (9th Cir. 1969), cert. den., 397 U.S. 923, 1015, 90 S.Ct. 915, 25 L.Ed.2d 104 (1970); United States v. Aronson, 319 F.2d 48, 52 (2d Cir.), cert. den., 375 U. S. 920, 84 S.Ct. 264, 11 L.Ed.2d 164 (1963). However, that discretion cannot

---

3. The Advisory Committee Note to the 1966 amendment of Rule 18 says in part: "The former requirement for venue within the division operated in an irrational fashion. Divisions have been created in only half of the districts, and the differentiation between those districts with and those without divisions often bears no relationship to comparative size or population. In many districts a single judge is required to sit in several divisions and only brief and infrequent terms may be held in particular divisions. As a consequence under the original rule there was often undue delay in the disposition of criminal cases—delay which was particularly serious with respect to defendants who had been unable to secure release on bail pending the holding of the next term of court."

be used as an excuse not to give "due regard to the convenience of the defendant and the witnesses" in fixing the place of trial. Fed.R.Crim.P. 18.

Within the circumstances of this case, we hold that the District Court did not violate appellants' rights secured by Rule 18 in trying appellants at Lexington and Pikeville instead of at Jackson. The assignment of cases within a district is a matter within the exclusive domain of the local district judges. Transfer of a particular case from one place within the district to another place within the district is a matter for the local district judges to decide, and the assent of a defendant to such a transfer is not required.

Other circuits have reached results consistent with our decision of the Rule 18 issue. For example, in United States v. Clark, 416 F.2d 63, 64 (1969), the Ninth Circuit held that after one federal trial ended in a mistrial and a second trial was held 90 miles away at another location in a district not divided into divisions, the change in place of trial was not an impermissible change in venue. The Second Circuit in United States v. Fernandez, 480 F.2d 726, 730 (1973), relying on the 1966 amendment to Rule 18 which eliminated division venue, stated that it follows *a fortiori* that when a district is not separated into divisions that trial at any place within the district is allowable under the Sixth Amendment[4] and Rule 18. See also, United States v. Wilson, 368 F.2d 842, 843 (1966), in which the Second Circuit held that because the District of Connecticut was not divided into divisions no order of transfer was required for trial at a location within the district different from the location at which the defendant was arraigned.

(B) Appellants next contend that the District Court's transfer of this case to Pikeville violated the following provision of 18 U.S.C. § 3240:

"Whenever any new district or division is established, or any county or territory is transferred from one district or division to another district or division, prosecutions for offenses committed within such district, division, county, or territory prior to such transfer, shall be commenced and proceeded with the same as if such new district or division had not been created, or such county or territory had not been transferred. . . . ."

In an order, entitled "In The Matter of Reassignment of Counties to The Catlettsburg, Lexington and Pikeville Jury Divisions,"[5] the three District Judges of the Eastern District of Kentucky on December 15, 1972, transferred all pending cases on the Jackson docket which arose in Perry County to the Pikeville docket. The judges indicated that transfer of these cases, then 17 in number, would provide for more expeditious disposition of the business of the District Court.

Appellants' contention that § 3240 required that they be tried at Jackson is meritless. Their argument is premised on the mistaken belief that Jackson is a division of the Eastern District of Kentucky. 28 U.S.C. § 97(a) merely names Jackson as one of eight locations in the Eastern District for the holding of court. The statute does not create divisions in the Eastern District of Kentucky as they exist in some other federal judicial districts. Thus when the District Court on December 15, 1972, transferred all pending cases on the Jackson docket that arose in Perry County to the Pikeville docket (including the instant one), it did not transfer the cases from

---

4. The Sixth Amendment provides in part that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law * * *."

5. The phrase "jury division," as used here, refers to the court created grouping of counties into units for the administrative purpose of selecting names to be placed in the master jury wheel of the district. The phrase does not refer to any congressionally created divisions in the Eastern District of Kentucky.

one division to another division within the meaning of § 3240.

■ (C) Appellants also contend that their trials at Lexington and Pikeville by panels of jurors selected at large from the Eastern District of Kentucky violated the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 et seq. The gravamen of their claim here is that the selection of jurors from the district at large contravenes provisions in the Jury Selection Plan of the Eastern District of Kentucky (the Plan), which was promulgated pursuant to 28 U.S.C. § 1863.

The Jury Selection Plan of the Eastern District of Kentucky was drafted by the judges of that court. It was approved as of September 23, 1968, by the Reviewing Panel provided for in 28 U.S.C. § 1863(a), which panel included the members of the Judicial Council of the Sixth Circuit.

■ Section Seven is the primary provision in the Plan challenged by appellants. It provides as follows:

"On individual request, any judge of the court may excuse a juror on finding that such service would entail undue hardship or extreme inconvenience if the juror resides at a distance more than 70 miles from the place of holding court."

This provision of the Plan is entirely consistent with 28 U.S.C. § 1863(b)(7) which directs the District Court to establish a plan which would "fix the distance, either in miles or in travel time, from each place of holding court beyond which prospective jurors residing shall, *on individual request therefor,* be excused from jury service. . . ." (Emphasis supplied.) There is nothing in the record of this case to indicate that any of the jurors selected at large from the district who heard this case requested to be excused from jury duty or that any such request was denied.

■ Further, appellants' claim that Section Seven of the Jury Selection Plan violates the 28 U.S.C. § 1861 declaration of policy that juries be selected at random from a fair cross section "of the community in the district or division wherein the court convenes" is equally meritless. A paragraph in Section Five of the Plan provides as follows: "Jurors from any part of the district may be required to serve at any of the places where court is held." Thus the Plan specifically sanctions the practice of selecting jurors from the district at large.

The present case, by an order dated August 1, 1973, was transferred from the Pikeville docket to the Lexington docket to be tried by a jury panel drawn from the district at large. After noting the large number of cases pending on the Pikeville docket and the defendants' interest in a speedy trial,[6] the District Court in that order stated: "[T]he Court's schedule is such that a more orderly and efficient disposition of these cases could be experienced at a central location and with a jury panel drawn from the district at large."

Accordingly, we hold that the provision in Section Five of the Jury Selection Plan permitting jurors to be drawn from the district at large does not violate any of appellants' rights and is compatible with the 28 U.S.C. § 1861 requirement that the jury be drawn from "the community in the district or division wherein the court convenes." The Section Five provision does not in practice operate in a vacuum. It operates in conjunction with Section Seven of the Plan which under certain circumstances permits prospective jurors to be excused if they reside more than 70 miles from the place of holding court.

### III. *Criminal Procedure Issues*

In addition to the judicial administration issues, several issues of criminal procedure are raised by appellants. We

6. This case had been pending on the Pikeville docket for over seven months prior to its transfer to the Lexington docket.

find these contentions also to be without merit.

(A) Appellants assert that the warrantless search of their truck by the Kentucky state police officers and the seizure of the blasting caps and other items violated their Fourth Amendment rights. The Government contends that once the police officers in the course of issuing a traffic citation spotted the boxes labeled "danger electrical blasting caps" (or language substantially to that effect) in the camper, then justification existed for the warrantless search and seizure. For the reasons set forth below, we agree with the Government's position under the circumstances of this case.

(1) The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

"The Fourth Amendment does not denounce all searches or seizures, but only such as are unreasonable." Carroll v. United States, 267 U.S. 132, 147, 45 S. Ct. 280, 283, 69 L.Ed. 543 (1925). See also Terry v. Ohio, 392 U.S. 1, 20–27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■■■■ It is universally accepted that "the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure." Terry v. Ohio, supra, 392 U.S. at 20, 88 S.Ct. at 1879. Searches conducted without a warrant are per se unreasonable under the Fourth Amendment, except in "a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). Among the exceptions arguably relevant to this case are searches for evidence in plain view of a police officer justified in being where he

is, Coolidge v. New Hampshire, 403 U.S. 443, 465–472, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968), searches in certain exigent circumstances, Warden v. Hayden, 387 U.S. 294, 298–299, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); McDonald v. United States, 335 U.S. 451, 454–455, 69 S.Ct. 191, 93 L.Ed. 153 (1948), searches of a moving vehicle, Carroll v. United States, supra, and searches incident to a lawful arrest, Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925). In a recent case, United States v. Robinson, 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973), the Supreme Court held that "in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."

No amount of probable cause can justify a warrantless search or seizure absent one of the exceptions. Coolidge v. New Hampshire, supra, 403 U.S. at 468, 91 S.Ct. 2022. Similarly, use of each of the exceptions to justify a warrantless search hinges on the presence of probable cause to search. See, e. g., Chambers v. Maroney, 399 U.S. 42, 48, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); Carroll v. United States, supra, 267 U.S. at 155–159, 45 S.Ct. 280; and the Court's statement in Almeida-Sanchez v. United States, 413 U.S. 266, 269, 93 S.Ct. 2535, 2537, 37 L.Ed.2d 596 (1973), "Automobile or no automobile, there must be probable cause for the search."

Probable cause exists where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. Carroll v. United States, supra, 267 U.S. at 162, 45 S.Ct. at 288.

Probable cause means "more than bare suspicion." Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). It means "a reasonable ground for belief of guilt." *Id.*

(2) In the present case, the state police officers aided by the beam from their cruiser's headlights observed the marked boxes through the window in the camper as they approached the pickup. If this observation constituted a search, it clearly was a reasonable one within the circumstances of this case. Terry v. Ohio, *supra,* 392 U.S. at 21–22, 45 S.Ct. 280; United States v. Booker, 461 F.2d 990, 992, 993 (6th Cir. 1972) (majority and concurring opinions). Nothing in the Fourth Amendment could be held to require police officers stopping a vehicle in the middle of the night in order to issue a traffic citation to turn off their cruiser's headlights before approaching the stopped vehicle. United States v. Robinson, 414 U.S. 218, 234, n. 5, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), emphasizes the danger of assaults on police officers in the course of making arrests for such traffic offenses.

(3) After the officers in the present case observed the marked boxes, they proceeded to the front of the pickup where they asked the driver, appellant Lewis, for his license. While standing at the front of the truck, the officers noticed two rifles and certain tools in the cab of the truck.

Concerning the sequence of events after the officers reached the front of the truck, Trooper Alexander Collins, one of the two officers, testified as follows in Perry Magistrate's Court, District #. 2:

"A. Well, we asked to see the operator's license, of Mr. Lewis. At this time I didn't know the reputation of these people, but Trooper Thompson seemed to know them fairly well, and since they did have weapons in the truck and tools, we asked them to get in the cruiser and he placed them under arrest and give them their rights.

"Q.25 What did he arrest them for?

"A. Possession of burglary tools.

"Q.26 Are those the tools that he arrested them for?

"A. Yes, sir, they are.

"Q.27 And that's a conventional lug wrench and a conventional set of bolt cutters?

"A. Yes, sir."

Trooper Leroy Thompson was the only one of the two arresting officers to testify in the trial at the District Court. He was not asked expressly if he and Trooper Collins observed the rifles and burglary tools at the time they were at the front of the pickup. However, he testified that the two rifles were standing upright in the middle of the cab and the tire tool and the bolt cutters were on the floor (as opposed to being under the seat). Thus the rifle and tools were positioned in readily observable locations.

With respect to why appellants were placed under arrest, Trooper Thompson was questioned as follows in the Magistrate's Court:

"Q.9 And when you placed them under arrest over at Busy, in Perry County, Kentucky, what did you advise them at that time that you were arresting them for?

"A. At the time I advised them: because of the tail lamps, because of the loud muffler, because of the burglary tools, and also because of the dynamite, but I didn't bring the dynamite charges against them. That case was taken by Detective Jarvis, and also AT&F agent, Larry Hatton."

On cross examination in the Magistrate's Court, Trooper Thompson further testified:

"Q.48 Why did you arrest the passenger if you—if the original charge was strictly a loud muffler and tail light?

A. Because I seen the dynamite caps, because the vehicle that was hauling them was not marked as such, because in my belief they were stolen."

This testimony contains one of the few references in the record to the fact that

appellants by the mere act of transporting the explosive materials without either the marking "Explosives" or "Danger" on the side of the pickup were committing a state statutory offense. K.R.S. § 189.160. The federal statute, 18 U.S.C. § 842(h), on the other hand, only makes it illegal to transport explosive materials if they are stolen. The appellants were never charged with a violation of K.R.S. § 189.160.

■■■ (4) We come now to the question of whether probable cause existed for the search of the camper. Nothing in the federal statute, 18 U.S.C. § 842(h), makes it illegal to transport blasting caps. Appellants' pickup carried a sign "General Construction Company." The police officers had no knowledge at the time of the arrest that blasting caps were missing from a construction company's magazine in a nearby county. The theft was not discovered until the next morning. The officers were not in the neighborhood investigating construction company thefts. They were staked out on a drunkenness complaint.

On the other hand, the officers noticed this heavily loaded pickup (not a transport truck as is usually required to carry explosive materials) traveling in a rural area of eastern Kentucky about midnight on a Sunday night of a Labor Day weekend. Further, the officers noticed a large supply of electrical blasting caps in the camper and appellants refused to state what was in the camper and declined to open the camper for the officers to inspect. The officers noticed two rifles and muddied tools which in their opinion were burglary tools. Considering these circumstances balanced against those in the previous paragraph, we hold that the officers had probable cause to search the camper. They had more than a "bare suspicion" that the blasting caps were stolen. .

■■■ (5) Given the presence of probable cause to search the camper, were the officers required by the Fourth Amendment to obtain a warrant prior to the search? For the reasons set forth below, we think not.

First, the marked boxes, which contained the stolen blasting caps and which were seized from the camper, were in "plain view" of the officers. Coolidge v. New Hampshire, *supra,* 403 U.S. at 465–472, 91 S.Ct. 2022; Harris v. United States, *supra,* 390 U.S. at 236, 88 S.Ct. 992.

> "What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused." Coolidge v. New Hampshire, *supra,* 403 U.S. at 466, 91 S.Ct. at 2038.

The officers in the present case were justified in intruding on the appellants to issue them a traffic citation. In the routine performance of the their duties, they saw the incriminating evidence.

Second, exigent circumstances in the present case rendered it impractical for the officers to obtain a warrant and justified the warrantless search. Warden v. Hayden, *supra,* 387 U.S. at 298–299, 87 S.Ct. 1642; McDonald v. United States, *supra,* 335 U.S. at 454–455, 69 S.Ct. 191. In denying a motion to suppress the blasting caps the District Court listed the following factors which constituted exigent circumstances: 1) the presence of inherently dangerous explosives, 2) the officers' concern that dynamite might be stored along with the blasting caps (a wrecker operator refused to tow the truck), 3) the hour of night (about midnight), 4) the knowledge by one of the officers that at least one of the appellants was an exconvict, and 5) the mobility of the vehicle.

Further, the circumstances of this case fit within the exception to the warrant requirement that permits a search of an automobile on the highway where there is probable cause to support the search and "where it is not practicable to secure a warrant, because the vehicle

can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." Carroll v. United States, *supra,* 267 U.S. at 153, 45 S.Ct. at 285. *See also* Coolidge v. New Hampshire, *supra;* Chambers v. Maroney, *supra;* Dyke v. Taylor Implement Mfg. Co., 391 U.S. 216, 88 S.Ct. 1472, 20 L. Ed.2d 538 (1968).

The officers assuredly would have been derelict in their duties if, while believing that explosives were in the camper, they had taken appellants to jail and left the pickup abandoned in this rural area. The Supreme Court held recently in Cady v. Dombrowski, 413 U.S. 433, 448, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), that where the trunk of an automobile which an officer reasonably believed to contain a gun was vulnerable to intrusion by vandals, the search of the trunk was not unreasonable within the meaning of the Fourth Amendment.

Finally, the Government contends that the warrantless search of the camper was justified because it was incident to a lawful arrest. Chimel v. California, *supra;* Agnello v. United States, *supra.* Initially, we should note that the arrest must be a lawful one in order to justify the search. Manning v. Jarnigan, 501 F.2d 408 (6th Cir. 1974). Moreover, the rule of this court was stated in Stidham v. Wingo, 452 F.2d 837, 841 (6th Cir. 1971), in which we quoted approvingly the following language of Chief Judge Murrah in United States v. Humphrey, 409 F.2d 1055 (10th Cir. 1969):

> "We are in complete agreement with the prevailing federal and state authority which condemns the search of persons and automobiles following routine traffic violations. Such searches can only be justified in exceptional, on the spot circumstances which rise to the dignity of probable cause."

Subsequent to *Stidham,* the Supreme Court in the companion cases of United States v. Robinson, *supra,* and Gustafson v. Florida, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973), sanctioned wider search of the person incident to traffic violations. In both cases probable cause was either conceded or clearly present. In United States v. Robinson, a police officer made a custodial arrest of a traffic offender for driving while his license was revoked. The officer made a search of the offender's person, in the course of which he found in an inside coat pocket a cigarette package containing heroin. The Supreme Court held that the heroin was admitted into evidence lawfully in the traffic offender's subsequent trial for a drug offense, saying that the search was not only incident to a lawful arrest but was also reasonable. Similarly, in Gustafson v. Florida, during the course of a patdown search of the person of a traffic offender who had been arrested for not having his driver's license in his possession, the arresting officer seized some marihuana cigarettes. The Supreme Court upheld this search and seizure on the same grounds stated in United States v. Robinson. *See also* United States v. Edwards, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), for an even more recent statement by the Supreme Court on the validity of a search incident to an arrest.

In neither United States v. Robinson nor Gustafson v. Florida was any issue raised as to a warrantless search of the *vehicle* (as opposed to the person) subsequent to arrest for a traffic offense. Accordingly, if the appellants in this case had been arrested solely for the traffic offense of defective tail lights and loud muffler,[7] we would adhere to the rule in *Stidham* and decline to uphold the warrantless search of the camper as one properly conducted incident to an arrest for a traffic offense.

On the other hand, there is evidence from which the District Court could conclude that appellants were arrested for the traffic offenses and for the possession of burglary tools, or solely for the

---

7. As indicated by the testimony recited in III(A)(3) of this opinion, there exists some uncertainty as to the exact offense for which appellants were arrested.

possession of burglary tools as suggested at one time by one of the officers in Perry Magistrate's Court. Considering all the exceptional circumstances of this case recited above, we hold the warrantless search of the camper was justified as being incident to the arrest for possession of burglary tools.

 (B) Appellants next contend that the District Court erred in permitting the Government to introduce into evidence a pair of bolt cutters and a tire tool because they were obtained without a warrant from Kentucky police officers. The Kentucky officers had used this evidence in two earlier prosecutions of appellants in Kentucky state courts. The appellants filed a motion for the return of the items after the first state trial.

This court previously has disposed of this issue in United States v. Gargotto, 476 F.2d 1009, 1014 (1973), in which we stated as follows:

> "Evidence legally obtained by one police agency may be made available to other such agencies without a warrant, even for a use different from that for which it was originally taken. Gullett v. United States, 387 F.2d 307 (8th Cir. 1967), cert. denied, 390 U.S. 1044, 88 S.Ct. 1645, 20 L.Ed.2d 307 (1968)."

The fact that a motion has been filed for the return of the evidence has no bearing on the rule that one police agency need not get a warrant prior to obtaining evidence from another police agency.

(C) Appellants contend finally that the District Court erred to their prejudice in permitting the Government to introduce evidence in attempting to prove that appellants had stolen the blasting caps from a construction company's magazine. The claimed prejudice is that it would indicate to the jury their prior conviction in Leslie Circuit Court on a charge of breaking and entering.

To prove a violation of 18 U.S.C. § 842(h), the Government had to show that appellants knew or had reasonable cause to believe that the blasting caps were stolen. Consequently, the prosecution had to prove a theft. Evidence that the appellants committed the burglary of the magazine was properly admissible as proof of the scienter required by 18 U.S.C. § 842(h).

Appellants' reliance on United States v. Baker, 494 F.2d 1262 (6th Cir. 1974) is misfounded. In that case, it was conceded that the evidence which we found prejudicial was "not relevant to proving the crime charged." 494 F.2d at 1265. In the present case, the evidence of the burglary was directly related to the offense charged.

Affirmed.