**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John E. TEST, Defendant-Appellant.**

**Francis R. SALAZAR, Petitioner-Appellant,**

v.

**UNITED STATES of America, Respondent-Appellee.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Enrique Sandoval CHAVEZ, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Cameron David BISHOP, Defendant-Appellant.**

**Nos. 73–1337, 75–1773, 75–2001 and 75–1899.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted July 8, 1976.

Decided Nov. 12, 1976.

Rehearing Denied Dec. 17, 1976.

Michael E. Tigar, Washington, D.C., Harold A. Haddon, Louis M. Fischer, Denver, Colo., and John Mage, for appellant Bishop and Cameron David Bishop, pro se, on the brief for appellant Bishop.

Walter L. Gerash and Robert C. Floyd, Denver, Colo. (Louis M. Fischer, Denver, Colo., with them on the brief), for John E. Test.

Robert L. Pitler of Levine, Pitler & Westerfeld, P. C., Denver, Colo., on brief for Francis R. Salazar.

E. Michael Canges of Canges & Shaver, Denver, Colo., on brief for Enrique Chavez.

Arthur H. Bosworth II, Sp. Asst. U.S. Atty. and James L. Treece, U.S. Atty., J. Terry Wiggins, Stephen E. Munsinger, C. Scott Crabtree, Asst. U.S. Attys., on brief for the U. S.

Before LEWIS, Chief Judge and SETH, HOLLOWAY, McWILLIAMS, BARRETT and DOYLE, Circuit Judges.

LEWIS, Chief Judge.

The above-captioned cases were consolidated for consideration of defendants'[1] in-

---

1. All of the above-captioned cases, with the exception of *Salazar v. United States,* are direct appeals from federal criminal convictions. Salazar's present appeal was commenced as a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255, after his original conviction for misapplication and conspiracy to misapply federally insured bank funds was affirmed by this court. *United States v. Cooper,* 10 Cir., 464 F.2d 648. Since Salazar was released from custody prior to final disposition of his habeas corpus petition, he moved to redesignate his petition as a "Motion in the Nature of a Writ of Error Coram Nobis." Although technically a "civil" action, Salazar's present appeal involves issues essentially "criminal" in nature and raises the same challenges and relies on the same evidence presented by the criminal cases consolidated for review. In fact, Salazar's motion was consolidated with the criminal case of *United States v. Bishop* at the evidentiary hearing below. For purposes of this opinion Salazar will therefore be referred to as a "defendant" and will be included in collective references to the "defendants" and will be included in collective references to the "defendants" in the above-captioned cases.

Although Salazar did not raise his present challenges to the grand and petit juries on direct appeal, *United States v. Cooper, supra,* the district court correctly held that Salazar had not waived these claims since a timely motion attacking the jury selection plan was made at his original trial as required by section

dividual challenges to the jury selection plan adopted by the district court for the District of Colorado as violative of the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861 *et seq.*, as amended (the Act), and the fifth and sixth amendments to the United States Constitution. Pursuant to the mandate of the Supreme Court in *Test v. United States*, 420 U.S. 28, 95 S.Ct. 749, 42 L.Ed.2d 786, defendants were allowed to inspect both the master and qualified jury wheels and the qualifying questionnaires returned by prospective jurors. Following a consolidated evidentiary hearing at which defendants presented documentary and testimonial evidence concerning the alleged defects in the Colorado jury selection plan, the district court concluded defendants had failed to meet their burden of proof. *United States v. Test*, D.Colo., 399 F.Supp. 683; *United States v. Bishop*, D.Colo., No. 69–CR–35, decided August 14, 1975 (unpublished opinion).

### Issues

■ Defendants Bishop and Salazar allege that Chicanos, blacks, and persons under forty years of age were "substantially underrepresented" on the master jury wheel in use during 1969 and early 1970 and that neither the grand nor petit juries drawn from that wheel were "selected at random from a fair cross section of the community" as required by the Act and the fifth and sixth amendments to the United States Constitution. Similar challenges are

raised by the remaining defendants (hereafter collectively referred to as the "Test" defendants) with respect to the underrepresentation of Chicanos and blacks on the master jury wheel in use from January 1972 through December 1974.[2] Bishop and Salazar also allege that certain of the excuse, exemption, and disqualification categories authorized by the Colorado jury selection plan are, both on their face and as applied, violative of the Act.[3] Since all of the defendants have challenged the Colorado jury selection plan on grounds that Chicanos and blacks were underrepresented on the master jury wheels, we will direct our attention to these common claims before considering the additional challenges raised by Bishop and Salazar.

### I. Underrepresentation of Chicanos and Blacks.

### A. The Colorado Jury Selection Plan.

■ As required by section 1863(b)(2) of the Act, the Colorado jury selection plan utilizes voter registration lists as the initial source of names for potential jurors. Names are selected from these lists at fixed intervals and placed into a master jury wheel, from which the qualified jury wheel is in turn selected at random. Defendants concede this selection process is mathematically random and the demographic composition of the master jury wheel accurately reflects the composition of the voter registration lists.[4] Defendants' challenges are

---

1867 of the Act. *United States v. Bishop*, D.Colo., No. 69–CR–35, decided August 14, 1975, at 2 n. 1, *citing Kaufman v. United States*, 394 U.S. 217, 89 S.Ct. 1068, 22 L.Ed.2d 297.

These cases were heard by the court en banc on the single issue of the validity of the Colorado jury selection plan as a question common to the named appellants and numerous other appellants having pending appeals. Other appellate questions, if any, of particular defendants are not here decided and will be the subject of separate opinions.

**2.** The Test defendants initially claimed that blacks, Chicanos, American Indians, students, young persons, poor women, and poor people were "systematically excluded" and "underrepresented" on the master jury wheel and at all subsequent stages of the jury selection process. Both at the evidentiary hearing and in their

briefs on appeal, however, the Test defendants conceded that no "serial dilution" or "systematic decimation" of these groups had been discovered and that their evidence below and the issues prosecuted on appeal related solely to the alleged underrepresentation of Chicanos and blacks on the master jury wheel.

**3.** The fact that defendants are not members of some of the allegedly excluded classes does not affect their standing to bring the present actions. *Taylor v. Louisiana*, 419 U.S. 522, 526, 95 S.Ct. 692, 42 L.Ed.2d 690; *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83.

**4.** The Colorado judicial district is divided into three divisions referred to as the Denver, Pueblo, and Grand Junction Divisions. Every seventy-fifth name is selected from the voter regis-

therefore directed toward the alleged disparity between the proportion of Chicanos and blacks in the voting-age population of the Colorado judicial district, as evidenced by the 1970 census, and the proportion of Chicanos and blacks appearing on the voter registration lists (the primary source lists), as evidenced by their proportional representation on the master jury wheels.

B. *Defendants' Evidence.*

Defendants' evidence on these issues for the periods in question consisted of judicially-noticed figures from the 1970 census, statistical abstracts compiled by defendants from the qualification questionnaires returned by prospective jurors, and expert testimony on the statistical significance of this data. This evidence may be summarized in the following tables:

A. Average of All Divisions on January 27, 1969 (sample size 12, 810)[a]

| Race | Percentage on Master Jury Wheel | Percentage in Voting-Aged Population | Statistical Conclusion |
|---|---|---|---|
| Chicano | 6.935 | 10.3675 | Significant |

B. Average of All Divisions on January 27, 1969 (sample size 2,840).

| Race | Percentage on Returned Questionnaires | Percentage in Voting-Aged Population | Statistical Conclusion |
|---|---|---|---|
| black | 1.07 | 2.61 | Significant |

tration lists in the Denver and Pueblo divisions and every fiftieth name is selected from the Grand Junction division. Defendants' expert witness testified that the selection of names at fixed intervals from an alphabetical list is a statistically acceptable method of obtaining a "random" sample so long as the source list contains no periodicity of minority names. No evidence was presented indicating the names of blacks or Chicanos occurred with greater periodicity than the names of other persons on the voter registration lists in question.

Defendants have alleged, however, that the selection of every fiftieth name from the Grand Junction division and every seventy-fifth name from the two other divisions results in a "substantial overrepresentation" of the Grand Junction division on the master jury wheel. Mere geographical imbalance, absent evidence that an identifiable and cognizable segment of the community has been systematically excluded or underrepresented by reason of such imbalance, does not violate the statutory and constitutional requirement that the jury panel represent a "fair cross section 'of the community'." *United States v. Lewis,* 6 Cir., 504 F.2d 92, 99, *cert. denied,* 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466; *Williams v. Baker,* 10 Cir., 399 F.2d 681, 682; *United States v. Kelly,* 2 Cir., 349 F.2d 720, 778–79, *cert. denied,* 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544. Defendants presented no evidence regarding the possible discriminatory effects, if any, of this alleged imbalance. Moreover, the district court found that the initial selection of a proportionately higher number of jurors from the Grand Junction division was justified by the geographical characteristics of the Colorado judicial district (Grand Junction being located approximately 275 miles from Denver) and the comparatively higher percentage of prospective jurors from the Grand Junction division who requested individual excuses from jury service "on the ground of undue hardship in traveling to the place where court is held." 28 U.S.C. § 1863(b)(7).

The Act grants the chief judge of the district court discretion to "fix the distance, either in miles, or in travel time, from each place of holding court beyond which prospective jurors residing shall, on individual request therefor, be excused," *Id.,* and the record indicates this discretion was properly exercised. Moreover, the practical effect of the alleged initial "overrepresentation" of the Grand Junction Division, when considered in conjunction with the disproportionate number of "travel hardship" excuse requests from that division, was a "qualified" jury wheel more accurately reflecting a "fair cross section of the community" than would have been obtained had every seventy-fifth name from each division been selected. We are therefore not prepared to reverse the judgment of the trial court on the basis of defendants' unsupported, conclusory allegations of "overrepresentation."

C. Denver Division from January 1972 through June 1973 (sample size, 723)

| Race | Percentage on Returned Questionnaires | Percentage in Voting-Aged Population | Statistical Conclusion |
|---|---|---|---|
| Chicano | 4.88 | 8.93 | Significant |
| black | 1.94 | 3.00 | Not Significant |

D. Denver Division from January 1973 through December 1974 (sample size, 2020)

| Race | Percentage on Returned Questionnaires | Percentage in Voting-Aged Population | Statistical Conclusion |
|---|---|---|---|
| Chicano | 6.73 | 8.93 | Significant |
| black | 2.48 | 3.00 | Not Significant |

E. Denver Division on July 30, 1973 and May 29, 1974 (composite sample size, 2111)

| Race | Percentage on Returned Questionnaires | Percentage in Voting-Aged Population | Statistical Conclusion |
|---|---|---|---|
| Chicano | 6.20 | 8.93 | Significant |
| black | 1.94 | 3.00 | Significant b/ |

F. Grand Junction Division on July 2, 1973 (sample size, 832)

| Race | Percentage on Returned Questionnaires | Percentage in Voting-Aged Population | Statistical Conclusion |
|---|---|---|---|
| Chicano | 4.81 | 8.89 | Significant |
| black | 0.00 | 0.21 | Not Significant |

G. Pueblo Division on July 6, 1973 (sample size, 872)

| Race | Percentage on Returned Questionnaires | Percentage in Voting-Aged Population | Statistical Conclusion |
|---|---|---|---|
| Chicano | 12.84 | 16.29 | Significant |
| black | 1.49 | 2.90 | Significant |

a/ In contrast to the tables below, these figures were compiled from an examination of the actual Master Jury List rather than from returned juror questionnaires.

b/ The apparent anomoly between this statistical conclusion and the conclusion reached in Table C is allegedly attributable to the larger sample size on this date. The contrary conclusion reached in Table D, however, is unexplained.

Setting aside for the moment the government's attempt to discredit these fig-ures,[5] defendants' evidence establishes nothing more nor less than a very high statisti-

5. The government attacked these figures on grounds they failed to account for intermarriages between whites and Chicanos resulting in acquisition or loss of a recognized Spanish surname or to account for the allegedly disproportionate impact of the juror qualification requirements set forth in 28 U.S.C. § 1865, on blacks and Chicanos.

The government also challenged these statistics on grounds they were compiled from the questionnaires sent to prospective jurors, rather than from the actual master jury lists, many of which were not returned and some of which contained no ethnic or racial designation. This contention is supported by reference to the affidavit of counsel for defendant Bishop which contains both the percentage representation of Chicanos derived from an examination of the actual master jury lists and the percentage representation of Chicanos derived from the completed questionnaires:

cal probability that the voter registration lists, of which the master and qualified jury wheels were concededly representative, contained comparatively smaller proportions of Chicanos and blacks than the general voting-age population. The mathematical conclusion that the disparity between these two figures is "statistically significant" does not, however, require an *a priori* finding that these deviations are "legally significant" or that the Colorado jury selection plan fails to comply with either statutory or constitutional requirements.

## C. *The Statutory and Constitutional Standards.*

Section 1861 of the Act provides:

It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries *selected at random from a fair cross section of the community* in the district or division wherein the court convenes. . . .

28 U.S.C. § 1861 (emphasis added). This "policy" is implemented by the requirement of section 1862 that "[n]o citizen shall be excluded from service as a grand or petit juror in the district courts of the United States on account of race, color, religion, sex, national origin, or economic status." Section 1863(b)(2) directs the district courts to use voter registration lists or lists of actual voters as the initial sources of names for prospective jurors, with the former being the "preferred" source, and to "prescribe some other source or sources of names in addition to voter lists *where necessary* to foster the policy and protect the rights secured by sections 1861 and 1862." (Emphasis added).

■ The legislative history of the Act makes it clear that in enacting the above-quoted statutes Congress intended to allow some deviation from an exact demographic reflection of the community and that only "great" or "pronounced" disparities were to be remedied by supplementation. *See, e. g.,* 114 Cong.Rec. 1348 (remarks of Congressman Kastenmeir). Thus instead of prescribing an objective statutory standard of "necessity" for determining when supplementation of voter lists was required, Congress deferred this decision to the courts:

The voting list need not perfectly mirror the percentage structure of the community. But any substantial deviations must be corrected by use of supplemental sources. Your committee would leave the definition of substantial to the process of judicial decision.

S.Rep.No.891, 90th Cong., 1st Sess. at 17 (1967).

■ Although the Supreme Court has not directly considered the issue, the majority of lower federal courts have responded to this congressional mandate by construing the statutory "fair cross section" standard as the functional equivalent of the constitutional "reasonably representative" standard previously developed. *E. g., United States v. Whiting,* 8 Cir., 538 F.2d 220, 222; *Anderson v. Casscles,* 2 Cir., 531 F.2d 682, 685 & n. 1 (dictum); *United States v. Tijerina,* 10 Cir., 446 F.2d 675, 679–81. This construction is supported both by the legislative history of the Act, indicating Congress relied extensively upon the constitutional standard enunciated in prior Supreme Court decisions, and by dictum in the most recent pronouncement of the Court on the jury selection issue:

The unmistakable import of this Court's opinions, at least since 1940, . . . and not repudiated by intervening decisions, is that the selection of a petit jury from a representative cross sec-

Note 5—Continued

| | Denver | Grand Junction | Pueblo |
|---|---|---|---|
| % on Master Jury List | 5.41 | 3.88 | 14.02 |
| % Shown on Questionnaires | 4.01 | 1.98 | 10.22 |

These comparisons indeed show a substantial margin of error. In light of our subsequent disposition of this issue, however, we will accept defendants' figures for purposes of discussion.

tion of the community is an essential component of the Sixth Amendment right to a jury trial. Recent federal legislation governing jury selection within the federal court system [The Jury Selection and Service Act of 1968] has a similar thrust. . . .

We accept the fair-cross-section requirement [of the Act] as fundamental to the jury trial guaranteed by the Sixth Amendment and are convinced that the requirement has solid foundation. . .

*Taylor v. Louisiana,* 419 U.S. 522, 528–30 & n. 11, 95 S.Ct. 692, 697, 42 L.Ed.2d 690 (citations omitted). Thus the standard for adjudicating both statutory and constitutional challenges to jury selection plans requires at a minimum that "petit juries must be drawn from a source *fairly representative* of the community" and that:

. . . the jury wheels, pools of names, panels, or venires from which juries are drawn must not *systematically exclude distinctive groups* in the community and thereby fail to be *reasonably representative* thereof.

*Id.* at 538, 95 S.Ct. at 702 (emphasis added). In order to demonstrate a violation of this "fair-cross-section" standard in the present cases, defendants were therefore required to show: (1) that Chicanos and blacks constituted "distinctive groups in the community," (2) that these groups were "systematically exclude[d]" from the jury selection process,[6] and (3) that as a result of such exclusion ("thereby") the jury pools "fail[ed] to be reasonably representative" of the community.

### 1. *Cognizability*

With respect to the first of these requirements, the district court "presumed" blacks comprised a distinct class in the Colorado community. In the absence of specific evidence of local prejudice directed toward Chicanos,[7] the court "assumed" Chicanos

6. Prior to its most recent formulation of the standard to be applied in jury selection cases, *Taylor, supra,* the Supreme Court had required a showing of "purposeful discrimination" or deliberate and systematic exclusion." *E. g., Hamling v. United States,* 418 U.S. 87, 138, 94 S.Ct. 2887, 41 L.Ed.2d 590; *Alexander v. Louisiana,* 405 U.S. 625, 628, 92 S.Ct. 1221, 31 L.Ed.2d 536. This arguably stricter standard had in turn been adopted by several of the circuits including our own. *See, e. g.,* "An Analysis of Jury Selection Decisions" (Gewin, J.), *appendix to Foster v. Sparks,* 5 Cir., 506 F.2d 805, 811, 821–23. Thus, in *United States v. Smith,* 10 Cir., 521 F.2d 374, we stated:

. . . [A] claim of discriminatory selection of jurors "necessarily requires a showing that a recognizable, identifiable class of persons, otherwise entitled to be jury members, has been *purposefully and systematically excluded* from jury service."

*Id.* at 377, *citing Leggroan v. Smith,* 10 Cir., 498 F.2d 168.

There is some disagreement between the parties over the effect to be given the Supreme Court's omission of the term "purposeful" in the *Taylor* formulation. Rather than enter this debate over the unexpressed intent of the Supreme Court, we will assume, without deciding, that defendants were only required to demonstrate a systematic, rather than a purposeful, exclusion of distinctive groups.

7. The requirement that the class "excluded" comprise a "distinctive group[] in the community" is generally agreed to have originated in

*Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866. After noting that [t]hroughout our history differences in race and color have defined easily identifiable groups . . . requir[ing] the aid of the courts in securing equal treatment under the laws," the *Hernandez* Court went on to state that:

. . . other differences from the community norm may define other groups which need the same protection. *Whether such a group exists within a community is a question of fact.* When the existence of a distinct class is demonstrated, and it is further shown that the laws, as written or as applied, single out that class for different treatment not based on some reasonable classification, the guarantees of the Constitution have been violated.

*Id.* at 478, 74 S.Ct. at 670 (emphasis added). Based on a showing that residents of the Texas community in question distinguished between "white and Mexican," that persons of Mexican descent participated only minimally in business and community groups, that children of Mexican descent had recently been required to attend segregated schools, and that some restaurant and toilet facilities were still segregated, the *Hernandez* Court concluded that persons of Mexican descent, as evidenced by Spanish surname, constituted an "identifiable" class singled out for "distinct treatment" and held that "[t]he exclusion of otherwise eligible persons from jury service solely because of their ancestry or national origin is discrimination prohibit-

were a cognizable class as well. *United States v. Test,* D.Colo., 399 F.Supp. 683, 689. In the absence of factual findings by the district court regarding the cognizability of blacks and Chicanos, we likewise "presume" and "assume," without deciding, that blacks and Chicanos respectively constituted "distinctive groups in the [Colorado] community."

### 2. *Systematic Exclusion.*

Assuming defendants satisfied the requirement of showing blacks and Chicanos constituted distinctive groups, defendants still had the burden of proving that these groups were "systematically excluded" from the jury selection process. Two lines of Supreme Court cases have been found in which allegations of systematic exclusion have proven successful. In the so-called "rule of exclusion" cases, proof that a cognizable group had been *totally* excluded from jury service over a substantial period of time or had received only "token representation" has been held sufficient to raise an *inference* of discrimination and systematic exclusion. *E. g., Taylor v. Louisiana, supra; Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536; *Norris v. Alabama,* 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074. This inference alone was deemed sufficient to establish a prima facie case of systematic exclusion, and general asseverations of "good faith" by jury selection officials were deemed insufficient rebuttals. Consequently, the burden was shifted to the state to establish by specific evidence that constitutionally permissible procedures were employed to exclude an entire section of the community. *Id.*

Likewise, in cases where there has been a showing of "substantial underrepresentation" (short of total exclusion) or "systematic decimation" of a cognizable group at the various stages of the selection process *combined with* "obvious opportunities for discrimination," the Court has been willing to infer discrimination in the selection process. *E. g., Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567; *Carter v. Jury Commission,* 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549; *Whitus v. Georgia,* 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599; *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759. Again, once a prima facie case of exclusion was established the state's general protestations of good faith proved unavailing. Where the evidence of underrepresentation was not sufficient to raise the inference of discrimination, however, general explanations and averments of good faith by government officials were deemed sufficient rebuttals. *E. g., Swain v. Alabama, supra.*

▪ In the present cases, defendants conceded that blacks and Chicanos had not been totally excluded from the selection process and that their representation was more than token. Defendants likewise admitted that no evidence of "systematic decimation" or "obvious opportunities for discrimination" had been discovered in the selection process. Moreover, although defendants did allege that Chicanos and blacks, for a variety of reasons, failed to register to vote in the same percentages as whites, no evidence was presented indicating that different registration standards were applied to whites and non-whites or that the state had erected affirmative barriers to or deliberately interfered with the registration process.[8] Rather defendants'

ed by the Fourteenth Amendment." *Id.* at 479–80, 74 S.Ct. at 671.

Although decided under a fourteenth amendment equal protection claim, the *Hernandez* "cognizability" requirement has been consistently reaffirmed by the Supreme Court in cases involving fifth and sixth amendment challenges. *E. g., Taylor, supra* 419 U.S. at 528–30, 95 S.Ct. 692.

**8.** "[T]he circuits are in complete agreement that . . . neither the Act nor the Constitution require that a supplemental source of

names be added to voter lists simply because an identifiable group votes in a proportion lower than the rest of the population." *United States v. Evans,* 10 Cir., 542 F.2d 805, *citing United States v. Freeman,* 8 Cir., 514 F.2d 171; *United States v. Lewis,* 3 Cir., 472 F.2d 252; *United States v. Guzman,* 2 Cir., 468 F.2d 1245, *cert. denied,* 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed.2d 602; *United States v. Ross,* 9 Cir., 468 F.2d 1213, *cert. denied,* 410 U.S. 989, 93 S.Ct. 1500, 36 L.Ed.2d 188; *Camp v. United States,* 5

attempt to establish a prima facie case of systematic exclusion was based entirely on a showing of statistical disparity.

Defendants urge on appeal that this statistical disparity alone was sufficient to support the inference that blacks and Chicanos had been systematically excluded from the jury selection process and that the burden should therefore have shifted to the government to prove by specific evidence that the underrepresentation was produced by constitutionally permissible selection procedures. We have been cited to no case, however, in which a jury selection challenge based solely on statistical evidence has been successful. To the contrary the only case cited by the parties or disclosed by our research in which a similar question was considered by the Supreme Court is *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759.

In *Swain* a black defendant demonstrated that although 26% of the males over 21 in the county were black, only 10% to 15% of the grand and petit jury panels over a substantial period of years had been black.[9] *Id.* at 205, 85 S.Ct. 824. Notwithstanding the fact that the venires from which the grand and petit juries were drawn "unquestionably contained a smaller proportion of the Negro community than of the white community," however, the *Swain* Court

concluded that "[n]either the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group." *Id.* at 208, 85 S.Ct. at 829. Regarding the degree of "inaccuracy" which was constitutionally permissible the Court stated, "[w]e cannot say that purposeful discrimination based on race alone is satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%." *Id.* at 208–09, 85 S.Ct. at 829. Moreover, since the percentage of blacks on jury venires in *Swain* had been as low as 10% during the period in question, compared with 26% in the presumptively eligible population, the Court also implicitly held that a prima facie case of systematic exclusion was not established by demonstrating a disparity of as much as 16%. *Id.* at 205, 85 S.Ct. 824.

In the present cases the maximum disparity demonstrated by defendants between the percentages of blacks and Chicanos in the voting-age community and on the master jury rolls was approximately 4%. Since this figure is well below the 10–16% range of disparity approved in *Swain*, the district court properly concluded defendants had failed to establish a prima facie case of systematic exclusion and accepted the government's general explanations and asseverations of good faith in rebuttal.[10]

Cir., 413 F.2d 419, *cert. denied*, 396 U.S. 968, 90 S.Ct. 451, 24 L.Ed.2d 434. Although we could base our decision on this ground alone, we will proceed to consider defendants' remaining contentions.

9. *Swain* also proved no black had actually served on a petit jury in over ten years, *Swain, supra*, at 205, 85 S.Ct. 824, making the evidence of exclusion presented in *Swain* even more compelling than that advanced in the present cases. The Court attributed this total absence of black jurors to the exercise of peremptory strikes by both the prosecution and the defense, however, and concluded that the exercise of peremptory challenges could not be considered as part of the selection process. *Id.* at 209–28, 85 S.Ct. 824.

10. Without reviewing all of the government's proffered explanations for the disparities demonstrated below, we note that in adopting the voter registration lists as the "preferred source" of names for prospective jurors, Con-

gress not only intended to provide a relatively large and easily accessible source of names, but one to which all potential jurors would have equal access and which disqualified jurors solely on the basis of objective criteria. Nor was Congress unmindful of the initial "screening" function served by voter registration lists with respect to such requirements as citizenship, residency, and conviction of serious crimes. In fact, with the exception of literacy in the English language, the voter registration requirements reach the same concerns as the requirements for jury service set forth in 28 U.S.C. § 1865(b). In the absence of any specific evidence regarding the disproportionate impact, if any, of these requirements on blacks and Chicanos, we cannot conclude that the decision of Congress to adopt the voter registration lists as a preliminary screening device was unreasonable. Neither can we say that the district court erred in accepting the government's conten-

### 3. *Causation.*

In light of our conclusion that defendants failed to establish a prima facie case of systematic exclusion, it is unnecessary to consider whether this alleged exclusion "caused" the jury panels to "fail to be reasonably representative" of the community as would appear to be required by the Supreme Court's language in *Taylor v. Louisiana, supra,* and as in fact required by the district court. Nor need we decide at this juncture the validity of defendants' contention that a showing of causation is superfluous and that a demonstration of substantial underrepresentation of a cognizable group on the master jury wheel necessarily entails a showing that panels selected from that wheel were not reasonably representative of the community.

### D. *Defendants' Alternative Claims.*

Defendants contend, however, that the 10–16% absolute disparity standard approved in *Swain* cannot be dispositive of the present cases since blacks and Chicanos comprise less than 10% of the voting-age population in Colorado. Moreover, even if *Swain* is controlling on the constitutional challenge, defendants assert the Act created a different and higher statutory standard, imposing an affirmative duty on the district court to supplement the voter registration lists whenever a "substantial failure" to comply with its "fair cross section" requirement is demonstrated, irrespective of the cause of the misrepresentation.

Defendants' observations that the black and Chicano communities in Colorado are considerably smaller than the black community considered in *Swain* and that *Swain* was decided prior to passage of the Act are

valid distinctions. However, in light of the determinations of the majority of federal courts that the statutory and constitutional standards are functional equivalents and the fact that *Swain* remains the only pronouncement of the Supreme Court regarding the degree of underrepresentation necessary to support a prima facie case of systematic exclusion in the absence of obvious opportunities for discrimination, *Swain* must be afforded highly persuasive, if not controlling, significance. It is not necessary for us to base our decision solely on these grounds, however, since even if the hypothesis of a stricter statutory standard is accepted defendants still failed to meet their burden of proof.

Defendants have cited us to decisions in two circuits which appear to have adopted a bifurcated standard for constitutional and statutory jury selection challenges. *United States v. Jenkins,* 2 Cir., 496 F.2d 57, 64–66, *cert. denied,* 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394; *United States v. Fernandez,* 2 Cir., 480 F.2d 726, 733; *United States v. McDaniels,* E.D.La., 370 F.Supp. 298, 301–02, *aff'd sub nom., United States v. Goff,* 5 Cir., 509 F.2d 825, *cert. denied,* 423 U.S. 857, 96 S.Ct. 109, 46 L.Ed.2d 83. Although the jury selection challenges considered in these cases proved unsuccessful, the district court accepted arguendo the "absolute impact" standard [11] for statutory challenges developed in *Jenkins* and *Goff,* applied it to the evidence presented below, and concluded that "the *maximum* underrepresentation of either Chicanos or Blacks on the jury wheels in this district falls approximately halfway between the *minimum* underrepresentation found in *Jenkins* and the *maximum* underrepresentation permitted in *Goff.*" Test, *supra,* at 697; *Bishop, supra,*

---

tions that some of the demonstrated disparities could be explained by the operation of this screening process.

11. The absolute impact standard is designed to evaluate "the difference that would result in the absolute racial composition of the venire as the result of the underrepresentation of blacks [or other cognizable groups] as voters." *Jenkins, supra,* at 65. For example, if there were a 10% absolute differential between the propor-

tion of blacks on the master jury wheels (5%) and the proportion in the voting aged population (15%), the impact on a jury panel of 50 persons would be 10% × 50 = 5 persons. In other words a jury panel "accurately" reflecting the demographic composition of the voting-aged population would contain 5 more black persons than a panel selected from the under-representative jury wheel.

at 3. The district court also compared the absolute percentage disparities and the comparative percentage disparities [12] demonstrated in the present cases with those found in *Jenkins* and *Goff*. These comparisons were summarized in the following table, to which we have added statistics computed from *Swain* for purposes of comparison with a "strictly constitutional" standard.

| Mode of Comparison | Jenkins | Goff | Swain (Min.) | (Max.) | Test | Bishop-Salazar (Chicanos) | (Blacks) |
|---|---|---|---|---|---|---|---|
| Absolute Percentage Difference | 2.15% (min.) | 6.17% (max.) | 10% | 16% | 1.08% (max.) | 3.43% | 1.54% |
| Comparative Percentage Underrepresentation | 39% (min.) | 59% (max.) | 42% | 62% | 46% (max.) | 33% | 59% |
| Impact on Panel of 50 Jurors | 1.1 persons (min.) | 3.1 persons (min.) | 5.0 persons | 8.0 persons | 2.0 persons | 1.7 persons | 0.8 persons |
| Impact on Grand Jury of 23 | 0.5 persons (min.) | 1.1 persons (max.) | 2.3 persons | 3.7 persons | 0.9 persons (max.) | 0.8 persons | 0.4 persons |
| Impact on Petit Jury of 12 | 0.26 persons (min.) | 0.7 persons (max.) | 1.2 persons | 1.92 persons | 0.49 persons (max.) | 0.41 persons | 0.18 persons |

*Id.* Although defendants have questioned some of the district court's calculations, even if we were to accept defendants' figures the disparities demonstrated in the present cases would still be within the limits set by *Jenkins* and *Goff* and well below the range of disparity approved in *Swain*. ■ Defendants nevertheless complain these comparisons are "a classic example of the visceras of the Second and Fifth Circuits leading the viscera of the District of Colorado." Defendants have been unable to cite us to any precedent in support of their position, however, and overlook the fact that their suggested "standardized" approaches merely present alternative methods of measuring departures from a statistically ideal cross section of the community.[13] Irrespective of the analytical approach selected, the process of characterizing the "substantiality" of the data derived therefrom necessarily remains a subjective function. Congress could have performed this function itself and prescribed uniform statistical methods for measuring departures from an "ideal" rather than a "fair" cross section of the community. Congress could also have set objective figures measured in terms of percentages or standard statistical deviations for determining when these departures were "statistically significant" rather than merely legally "substantial." It did not choose to do so. Instead, Congress delegated this function to the courts to be performed on a case by case basis. What defendants in effect urge is that we reject the collective experience of the courts in performing this function and instead allow ourselves to be "led" by defendants' visceral reactions to the substantiality of the disparities demonstrated below. This we cannot do.

---

12. The absolute percentage difference is determined by subtracting the percentage of blacks on the jury rolls from the percentage of blacks in the voting-age population. For example if blacks comprised 15% of the voting-age population and 5% of the master jury wheels the absolute percentage difference would be 15% − 5% = 10%.

The comparative percentage difference is obtained by dividing the absolute percentage difference by the percentage of blacks in the voting-age community. 15% − 5% = 10% ÷ 15% = 67%.

13. Defendants advanced several, alternative, "objective," standards which would purportedly provide "uniform statistical criterion" to replace the "visceral reactions" of the courts in determining whether juries have been selected at random from a fair cross section of the community. These suggested approaches have been extensively discussed elsewhere, "An Analysis of Jury Selection Decisions," (Gewin, J.), *appendix to Foster v. Sparks*, 5 Cir., 506 F.2d 805, 811, 818, and were considered at length by the district court. Test, *supra*, at 693–95. We see no value in repeating those discussions here. We note in passing, however, that two of the suggested approaches cannot be applied to the present cases because no evidence of the comparative percentages of whites, blacks, and Chicanos registering to vote was presented, and that the other suggested standards produce opposite "conclusions" regarding the necessity for supplementation. *Id.* at 693–94.

Defendants also overlook the fact that in the day-to-day operation of the jury system, the criminal defendant is not indicted or convicted by the community at large, but rather by relatively small groups of 12 or 23 persons selected to represent the community on petit and grand juries. In assessing whether a given defendant's constitutional or statutory rights have been violated through the operation of a jury selection process, the proper focus of inquiry must therefore be the impact of the challenged process on the grand and petit juries. This assessment must be made in light of the well-settled rule that a defendant has no right to a grand or petit jury of any given demographic composition, but only to jury panels selected from a source "reasonably representative" of the community. *E. g., Taylor v. Louisiana, supra,* 419 U.S. at 538, 95 S.Ct. 692; *Alexander v. Louisiana, supra,* 405 U.S. at 628, 92 S.Ct. 1221. It must likewise be remembered that our jury system of necessity deals with living individuals rather than fractional percentage persons. Changes in the demographic composition of juries and jury panels can therefore only be made by the addition or deletion of one or more individuals. Both Congress and the courts have been mindful of this latter fact in concluding that only "gross" or "marked" disparities or "substantial" departures from a "fair cross section" of the community require judicial intervention.

We cannot say in the present cases that disparities of less than one person in the demographic composition of petit and grand juries are "substantial" or that a difference of two persons on a jury panel of fifty persons is a "gross" or "marked" disparity.[14] The judgment of the district court with respect to the alleged underrepresen-

tation of blacks and Chicanos is therefore affirmed.

## II. *The Additional Challenges of Bishop and Salazar.*

The remaining challenges presented by defendants Bishop and Salazar are essentially cumulative in nature in that the basic allegations of underrepresentation and suggested standards of "substantiality" are the same as those previously discussed. In each instance, however, a different group is substituted for the allegedly aggrieved parties, *viz.,* persons under forty, persons residing in the judicial district for less than one year, persons convicted or under indictment for serious crimes, persons not literate in the English language, persons residing in certain divisions of the district, women with custody of children under ten years of age, sole proprietors, and persons without transportation. These challenges were extensively considered by the district court and found to be without merit either because the exemption was specifically prescribed by the Act (the constitutionality of which was unchallenged), the group in question did not comprise a "cognizable" class in the community, or the alleged underrepresentation was not "substantial" under the standards set forth above. As defendants have advanced no new arguments and all cited and subsequent authorities support the judgment of the trial court on these issues, we adopt and set out the applicable portions of the trial court's unpublished opinion and affirm for the reasons stated by Chief Judge Arraj therein.

". . .

## "II. *The Underrepresentation of Persons Under Forty*

"Movants have collected data which they contend demonstrate a gross

---

**14.** In holding that the underrepresentation of blacks and Chicanos demonstrated by defendants is not substantial enough to warrant judicial intervention in a litigious context, however, we do not wish to be interpreted as condoning complacence on the part of the district courts in this circuit in their efforts to improve the representativeness of their jury selection plans. To the contrary, we encourage and commend the efforts which have been and are being made to evaluate additional source lists containing comparatively higher percentages of those groups presently underrepresented to some degree on the voter registrations lists.

underrepresentation of persons under forty years of age as compared to persons forty years or older. This claim is wholly without merit. In *Test*, we held that in order to establish a prima facie case of unconstitutionality, the challenger must prove that the group which is allegedly underrepresented is 'distinctive' or 'cognizable.' [*United States v. Test, supra,* at (688), slip opinion at 5] Evidence of cognizability is also required for a prima facie showing under the Jury Selection and Service Act. [*See, e. g., United States v. Ross,* 468 F.2d 1213, 1217 (9th Cir. 1972), *cert. denied,* 410 U.S. 989 [, 93 S.Ct. 1500, 36 L.Ed.2d 188] (1973); *United States v. Guzman,* 337 F.Supp. 140, 143 (S.D.N.Y.), *aff'd,* 468 F.2d 1245 (2d Cir. 1972), *cert. denied,* 410 U.S. 937 [, 93 S.Ct. 1397, 35 L.Ed.2d 602] (1973); *see also Gewin, An Analysis of Jury Selection Decisions,* appendix to *Foster v. Sparks,* 506 F.2d 805, 811 at 819–21] To establish cognizability, it is necessary to prove the following:

> (1) the presence of some quality or attribute which 'defines and limits' the group; (2) a cohesiveness of 'attitudes or ideas or experience' which distinguishes the group from the general social milieu; and (3) a 'community of interest' which may not be represented by other segments of society. [*United States v. Test, supra* at (689), slip opinion at 6]

There is no evidence in the record before us suggesting that persons between the ages of twenty-one and thirty-nine hold attitudes which are distinctive from those held by the rest of the population. Indeed, movants have offered no evidence concerning any of the three factors just enumerated. Although the cognizability of certain groups may be presumed or inferred from evidence other than these factors [*see United States v. Test, supra* at (689), slip opinion at 6], this is not the case where the groups are 'created' by arbitrarily subdividing the population into age classification. [*See, e. g., United States v. Olson,* 743 [473] F.2d 686 (8th Cir.), *cert. denied,* 412 U.S. 905 [, 93 S.Ct. 2291, 36 L.Ed.2d 970] (1973), and cases cited therein at 688; *United States v. Ross, supra* at 1217; *United States v. Ditommaso,* 405 F.2d at 385, 391 (4th Cir.) *cert. denied,* 394 U.S. 934 [, 89 S.Ct. 1209, 22 L.Ed.2d 465] (1968); *United States v. Quinn,* 364 F.Supp. 432, 436 (N.D.Ga., 1973); *United States v. Guzman, supra* at 145–46; *see also Pope v. United States,* 372 F.2d 710, 723 (8th Cir. 1967), *vacated on other grounds,* 392 U.S. 651 [, 88 S.Ct. 2145, 20 L.Ed.2d 1317] (1968)]

"Movants seek to distinguish their case from the cited precedents on the ground that the 'group' in question here is relatively large (47.85% of the eligible population). They argue that where an age group is this large it may be held 'cognizable' even without proof of uniqueness of attitudes or of any other elements normally required to establish cognizability. Our research discloses only one reported decision which supports this argument, *United States v. Butera,* 420 F.2d 564 (1st Cir. 1970). There the court confronted the following evidence:

TABLE B:  United States v. Butera [6]

| Age Group | Percentage Disparity (Comparative) |
|---|---|
| 21 - 24 | 92% underrepresented |
| 25 - 29 | 82% underrepresented |
| 30 - 34 | 51% underrepresented |
| 35 - 39 | 15% underrepresented |
| 40 - 44 | 17% overrepresented |
| 45 - 49 | 29% overrepresented |
| 50 - 54 | 29% overrepresented |
| 55 - 59 | 30% overrepresented |
| 60 - 64 | 37% overrepresented |
| 65 - 69 | 53% overrepresented |
| 70 - 74 | 17% overrepresented |
| 75 and over | 83% underrepresented |

[6] The values in this Table were calculated from the data appearing in *United States v. Butera, supra* at 569 n.13.

"The defendants in *Butera* 'collapsed' these twelve subgroups into two 'composite' groups, one comprised of persons 21 to 39 years of age and the other comprised of persons 40 or older. This approach was acceptable to the court because *all* subgroups below 40 were underrepresented in the pool of prospective jurors and all subgroups (with the minor exception of the 75 and over group) were overrepresented. [*See United States v. Butera, supra* at 570] In other words, the composites could be considered 'groups' because the constituent subgroups of each were internally consistent. It is important to recognize that the continuum of underrepresentation among the subgroups in the first composite and the continuum of overrepresentation among the subgroups in the second composite did *not* render the composites 'cognizable.' Rather, the existence of these continuums allowed the defendants to *treat the composites as groups* which might be compared to each other. It was the *size* of the resulting groups that made them cognizable.

"This rather difficult principle is best understood by example. Assume we have drawn a sample from a jury wheel and have divided it into the same twelve age groups originally used in *Butera*. We then compare the number of prospective jurors in each age group with the number we would expect based on census figures. Assume further that the first group (21 to 24) is underrepresented, that the second group (25 to 29) is overrepresented, that the third group (30 to 35) is underrepresented, and that the results for each successive group alternates from overrepresentation to underrepresentation. It should be obvious that we cannot 'collapse' the data for these subgroups into any larger composite groups. If we did, we would have one group comprised of persons between the ages of 21 and 24, 30 and 34, 40 and 44, 50 and 54, 60 and 64, and 70 and 74, while the other group would include those between 25 and 29, 35 and 39, 45 and 49, 55 and 59, 65 and 69, and 75 or over. These would not be 'groups' at all, but rather mathematical artifacts.

"This is precisely what movants in the present controversy have done. Their data for age groups are summarized in the following Table.

TABLE C

| Age Group | Percentage in Jury Wheels | Percentage in Population | Absolute Percentage Difference |
|---|---|---|---|
| 21 to 29 | 16.01% | 27.81% | 11.80% underrepresented |
| 30 to 39 | 19.66% | 20.04% | 0.38% underrepresented |
| 40 and over | 64.44% | 52.15% | 12.29% overrepresented |

What is critical about these data is that the jury wheels of this district are a nearly perfect mirror of the community for those persons between 30 and 39 years of age. This 'subgroup' is neither underrepresented nor overrepresented, but there *are* appreciable disparities for the 21 to 29 year old subgroup and for the over 40 subgroup. What movants have done here is 'collapse' the data for the 21 to 29 year old group (which is underrepresented) with the data for the 30 to 39 year old group (which is not underrepresented), thereby creating a composite of all persons between the ages of 21 and 39. But this composite does *not* have internal consistency, and its constituent subgroups do not represent a continuum of either underrepresentation or overrepresentation. Put more simply, the age group which is underrepresented, according to

movants' evidence, is *not* comprised of persons under 40, but rather of persons between the ages of 21 and 29. This is nothing more than a shrewd attempt to create a 'group' where none exists. It is exactly for this reason that courts demand proof of cognizability unless the group is inherently distinctive, as is the case for blacks and to some extent Chicanos. The court in *United States v. Guzman, supra,* stated the problem in these terms:

> Defendant has not explained why he has selected the age of 30 as a cut-off rather than the age of 26 or 33. He has presented no rationale for his age grouping. The mere fact of similarity in age cannot, by itself, be sufficient to define a cognizable group. If it were, *any jury selection system could be successfully attacked by a strategic drawing of age group lines.*
>
> Among any age group there will be vast variations in attitudes, viewpoints, and experiences. The fact that two persons are the same age does not necessarily give them a community of interest. And although we hear much talk of the "generation gap," it is impossible to define that gap with any precision, as the defendant has tried to do.
>
> In accordance with the long line of cases cited above, this court cannot accept the proposition that members of arbitrarily drawn age brackets necessarily constitute valid categories for measuring the legality of a jury selection system. [337 F.Supp. at 146 (emphasis added)]

We will not accept movants strategic manipulation of their data for the sole purpose of fabricating a 'group' of such size as to circumvent the normal evidentiary requirements of cognizability. Of course, it is possible to analyze the underrepresentation of the 21 to 29 year old group in terms of controlling constitutional and statutory principles, but under the precedents cited above, this group is not sufficiently large to permit any inference of cognizability without proof of distinctive attitudes held by its members and of the other factors described earlier. [*See especially United States v.*

*Briggs,* 366 F.Supp. 1356, 1362 (N.D.Fla. 1973)]  .

"Upon the foregoing, we hold that movants have not made a prima facie showing that persons under 40 years of age are a cognizable group. Consequently, movants' constitutional and statutory claims based on the alleged underrepresentation of this 'group' must be rejected.

"III. *Excuses, Exemptions, and Disqualifications*

"Movants have also mounted a two-pronged assault on the juror excuse, exemption, and disqualification procedures used in this district. First, they charge that the categories of excuses, exemptions, and disqualifications are on their face violative of 28 U.S.C. § 1861, which requires 'random selection' of jurors. Second, they allege that the categories 'have been administered in a haphazard and arbitrary fashion, thus preventing the securance of a jury drawn from a fair cross section of the community  .  .  . .'

"Specifically, movants observe that at the time of their indictments and at the time of Salazar's trial, persons between the ages of 18 and 21 were not eligible for jury service in this district. It is true that the jury plan did exclude such persons, but it did so pursuant to the statute then in force [28 U.S.C. § 1865(b)(1) (1970)], and the constitutionality of this statute was uniformly upheld. [*See, e. g., United States v. McVean,* 436 F.2d 1120 (5th Cir.), *cert. denied,* 404 U.S. 822 [, 92 S.Ct. 45, 30 L.Ed.2d 50,] *reh. denied,* 404 U.S. 952 [, 92 S.Ct. 277, 30 L.Ed.2d 269] (1971); *United States v. Arnett,* 342 F.Supp. 1255 (D.Mass.1970); *United States v. Gargan,* 314 F.Supp. 414 (W.D. Wis.1970), *aff'd sub nom., United States v. Gast,* 457 F.2d 141 (7th Cir.), *cert. denied,* 406 U.S. 969 [, 92 S.Ct. 2426, 32 L.Ed.2d 668] (1972)] [7]

[7] We note parenthetically that in conformance with § 3(a) of Pub.L. 92–269, the master jury wheels in this district were refilled from

the 1972 voter registration list, which reflected the registration of 18 to 20 year olds who had been enfranchised by ratification of the Twenty-sixth Amendment. The wheels were refilled before the September 1, 1973 deadline imposed by the statutory amendment.

■ "Next, movants challenge the exclusion of persons who have not resided within the district for at least one year. This provision of the district's jury plan is also authorized by statute [28 U.S.C. § 1865(b)(1)], and this section has also withstood constitutional attack. [*See, e. g., United States v. Gast, supra* at 142–43] [8]

[8] Movants do not suggest that they possess standing to assert any 'right to travel' claim which belong to those persons who are excluded from jury service by the one-year residency requirement. [*See also United States v. Grey*, 355 F.Supp. 529, 533 (W.D.Okl.1973)]

"Pursuant to 28 U.S.C. § 1865(b)(5), the jury plan excludes all persons who have a charge pending against them for the commission of a criminal offense punishable by imprisonment for more than one year. This 'disqualification is intended to assure the "probity" of the jury.' [*United States v. Arnett, supra* at 1261] The reasons for movants' challenge to this provision are beyond our comprehension.

■ "The fourth ground for attack is that the plan effectively excludes from petit jury service all persons who reside in the Pueblo and Grand Junction divisions, because the vast majority of the trials in this district are held in the Denver division. But the partitioning of a district into jury divisions is sanctioned by the statute [28 U.S.C. §§ 1863(a) and 1869(c)], and is clearly not unconstitutional, absent evidence that some cognizable group has been systematically excluded by 'gerrymandering' the division lines. [*See United States v. Test, supra* at (686), slip opinion at 3 n.2; *see also United States v. Ponder*, 444 F.2d 816, 821 (5th Cir. 1971), *cert. denied*, 405 U.S. 918 [, 92 S.Ct. 944, 30 L.Ed.2d 788] (1972); *cf. United States v. Lewis*, 504 F.2d 92, 99 (6th Cir. 1974)]

■ "Movants also contest the plan's disqualification of persons unable to read, write and understand the English language with sufficient proficiency to complete the juror qualification form. This provision is mandated by the Act. [28 U.S.C. § 1865(b)(2); see also *United States v. Tijerina*, 446 F.2d 675 (10th Cir. 1971); *United States v. Test, supra* at (691), slip opinion at 8 n.7] Since movants do not suggest that the persons disqualified by this provision constitute a cognizable group and *since* there is no evidence that the 'systematic exclusion' of some *other* cognizable group results from this disqualification, we hold that § 1865(b)(2) is constitutional. [*See also United States v. Valentine*, 288 F.Supp. 957, 970 (D.P.R.1968)]

■ "Movants' next contention is that under the jury plan certain classes of persons are automatically excused from jury service upon request without a specific factual showing of 'undue hardship or extreme inconvenience.' These classes include: (1) women who have legal custody of a child or children under the age of ten years; (2) sole proprietors; and (3) persons who do not have transportation available to attend court sessions. Apparently, movants believe that the statutory declaration of policy in 28 U.S.C. § 1861 precludes this district from excusing members of any 'describable,' which is not to say legally cognizable, group. Such a construction is much too severe. The statute expressly permits the court to specify in its plan those groups of persons who shall be excused on individual requests and contemplates that such excuses will be granted without inquiring into the circumstances of each particular case. [28 U.S.C. § 1863(b)(5)] The presumption of 'undue hardship or extreme inconvenience' which attaches to specified groups is founded upon common sense and experience. So long as such excuse categories are reasonably defined and do not result in either 'substantial underrepresentation' or 'systematic exclusion' of some *cognizable* group or groups, then the categories are

both statutorily and constitutionally permissible. [*See, e. g., Government of the Canal Zone v. Scott,* 502 F.2d 566, 569 (5th Cir. 1974)]

■ "As regards sole proprietors and persons without adequate transportation, movants have offered no evidence tending to show the cognizability of these groups or the correlation of these groups to some other class of persons that is legally cognizable. The presumption of hardship and inconvenience which the plan attaches to these two groups is, in our view, reasonable. [*See United States v. Grey,* 355 F.Supp. 529, 531 (W.D.Okl.1973); cf. *United States v. Lewis, supra* at 99; *Government of the Canal Zone v. Scott, supra* at 569; *United States v. Arnett, supra* at 1261]

"Similarly, excuses for women having custody of young children has been consistently upheld against statutory and constitutional challenges. [*See, e. g., United States v. Eskew,* 460 F.2d 1028, 1029 (9th Cir. 1972); *United States v. Briggs, supra* at 1362] Nor do we find any support for movants' position in the recent Supreme Court opinion in *Taylor v. Louisiana,* 419 U.S. 522 [, 95 S.Ct. 692, 42 L.Ed.2d 690] (1975). There the Court struck down a state statute which required women to affirmatively express their desire to serve as jurors before their names would be placed in the jury wheel. The Court held that the 'exemption' worked effectively to exclude women from jury service solely on the basis of their sex. But the plan of this district *excuses* women only upon their request and not solely because of their sex. All women, otherwise qualified, are presumptively eligible for jury service in this district, and the excuse which they may be granted is predicated on their actual, and not presumed, role in the home. In short, we draw no inference from *Taylor* that the excuse category challenged here is unconstitutional.

■ "The remaining excuse, exemption, and disqualification categories which mov-ants have attacked are all authorized by the Jury Selection and Service Act. As in the case of the claims discussed and rejected above, we have been offered no evidence that any of these categories result in substantial underrepresentation or systematic exclusion of any legally distinctive group. [*See especially United States v. Grey, supra*] Consequently, we reject these claims without further comment.

■ "The final issue raised by Bishop and Salazar relates to their allegations that the excuse, exemption, and disqualification categories have been administered in a 'haphazard and arbitrary fashion.' The only evidence offered in support of this claim is a group of juror qualification questionnaires, some of which were incorrectly coded by the jury clerks. But in *none* of these questionnaires was a prospective juror removed from the jury wheel when he or she was in fact qualified and *not* entitled to some excuse or exemption under the plan. We believe, and so hold, that the human errors in administration cited by movants here do not constitute a 'substantial failure to comply with the provisions' of the Jury Selection and Service Act. Moreover, movants have not endeavored to prove that these errors have excluded or caused the underrepresentation of any cognizable group. . . .

" . . . ."

The judgment of the district court regarding each of the issues raised on appeal is therefore affirmed.